[No. F029039. Fifth Dist. Dec. 8, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE RANGEL RODRIGUEZ, Defendant and Appellant.

**COUNSEL**

Carlo Andreani, under appointment by Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret Venturi and Alan B. Ashby, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WISEMAN, J.**—Here we confront an issue of first impression: When conducting a limited remand hearing on whether an attorney's reasons for

exercising peremptory challenges are race neutral under *Wheeler/Batson,*[1] is it mandatory for the original trial judge to conduct the hearing? We conclude the answer is no when the reasons given are objectively verifiable.

## PROCEDURAL HISTORY

Jose Rangel Rodriguez (defendant) was found guilty by jury of four felony counts: murder (Pen. Code,[2] § 187, subd. (a)), robbery (§ 211), forcible rape (former § 261, subd. (2)), and burglary (§ 459). With respect to the murder count, the jury found true three special circumstances under section 190.2, subdivision (a)(17), each alleging the murder was committed during the commission or attempted commission of the felonies alleged in the other three counts. At the end of the penalty phase, the jury fixed the sentence on count 1 at life without possibility of parole.

Defendant was sentenced on March 3, 1994. The court imposed life without possibility of parole on count 1, and stayed midterm sentences of four, six and four years, respectively, on the remaining counts, pursuant to section 654.

Defendant filed a timely appeal. The following facts from the first appeal[3] are foundational to this appeal: jury selection began December 1, 1993, before Judge Kim. On January 10, 1994, a 12-member jury was sworn, and selection of alternates began. The prosecutor exercised a peremptory challenge to excuse one of the potential alternates, and defendant made an immediate *Wheeler/Batson* motion concerning the prosecution's exercise of peremptory challenges against both members of the jury and alternates. The court denied the motion regarding selection of the 12-member panel as untimely, but found it both timely and meritorious with respect to the one potential alternate excused. The court refused to dismiss the entire panel and quash the venire, as defendant requested. Instead, it directed the excused panelist be seated if she was still available. The panelist had apparently left, however, and three alternates were selected and sworn from the remaining venire. Defendant filed a timely appeal.

In our partially published opinion, we first found that defendant's *Wheeler/Batson* motion was timely with respect to all three peremptorily challenged Hispanic jurors, not just the one potential alternate. We then determined that, although the trial court did err in failing to start jury

---

[1] *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; *Batson* v. *Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69].

[2] All statutory references are to the Penal Code unless otherwise indicated.

[3] *People* v. *Rodriguez* (1996) 50 Cal.App.4th 1013 [58 Cal.Rptr.2d 108].

selection anew, a harmless error analysis applied to the potential alternate juror. We subsequently found that ". . . any error with respect to the peremptory challenge of the alternate juror was harmless beyond a reasonable doubt . . . ." (*People* v. *Rodriguez, supra,* 50 Cal.App.4th at p. 1036.) Regarding the two Hispanic jurors who were challenged during the course of selecting the twelve-member jury panel, we directed: "This matter is remanded to allow the trial court to conduct a hearing to determine the validity of the prosecutor's peremptory challenges to prospective jurors Amelia R. and Donna S. If the trial court determines the prosecutor's reasons for excusing the two jurors were not racially neutral, and grants defendant's *Wheeler/Batson* motion, reversal and retrial is required. If the trial court determines the prosecutor's reasons for excusing the two jurors were racially neutral, and denies defendant's *Wheeler/Batson* motion, defendant's conviction is ordered reinstated." (*Rodriguez, supra,* at p. 1037.)

At a hearing on April 18, 1997, defense counsel informed the court that both sides had been notified Judge Kim was retired and did not want to return to handle the hearing. Defense counsel then argued "where the trial judge is unavailable for whatever reason and can't hear the case, can't hear the hearing, the limited remand, that we simply can't comply with what the Fifth District Court of Appeal has sent the case back for." Judge Kalashian, the judge presiding over the April 18 hearing, allowed defense counsel to "make a record" regarding his opinion as to the significance of the absence of Judge Kim, but set the limited remand hearing for June 20, 1997.

On June 20, 1997, the hearing occurred before Judge Kalashian. The district attorney presented his reasons why he excused the two jurors at issue, after which defense counsel was provided time to respond. Defense counsel again reiterated his concerns regarding the absence of Judge Kim. The matter was subsequently submitted to the trial court.

The court issued a written ruling on June 25, 1997, stating:

"After reviewing all relevant evidence this Court is satisfied that the Prosecutor's reasons for excusing jurors Amelia R. & Donna S. were racially neutral and denies defendant's Wheeler/Batson motion.

"Amelia R.—The two most significant reasons giv[en] for excusing this juror were: 1) her apparent (at least in the subjective behalf of Richard June) intellectual difficulty or confusion regarding the concept of reasonable doubt. (After reading the transcript of the Court's and Attorney's questions of this juror, this Court accepts the prosecutor's said subjective belief as being in good faith; 2) The fact that she had previously sat as a juror in a

rape case in which there was a hung jury along with the allegation in the instant case, that an act of rape was a special circumstance, is accepted by this Court as another good-faith reason for the prosecution's exercise of a preemptory challenge.

"Donna S.—This juror's brother-in-law was convicted of first degree murder, although she states that this would not make it difficult for her to be a juror in the instant case, this Court believes it is reasonable to expect that a prosecutor would not want a juror with this background to sit on a murder case and therefore, accepts the preemptory challenge on this ground alone as racially neutral without addressing the additional reason of the 'contractual relationship with Judge Kim' because it was not part of the transcribed record.

"Based upon the Fifth District Court of Appeal decision filed November 8, 1996 and its directive contained therein and the ruling set forth above, defendant's conviction is reinstated."

Defendant now appeals, contending: 1) a limited remand was improper when the original trial judge had retired and declined to participate; 2) the alleged contractual relationship between Donna S. and Judge Kim militated against another normally, adequately neutral explanation; and 3) facially race-neutral reasons were a pretext for discrimination.

## FACTUAL HISTORY[4]

In April 1989, defendant performed yard work for the victim, 62-year-old Josefina Aquino. Before completing the job, defendant requested an additional $20 in payment. Defendant was told no. He did not argue, but completed the work and was paid the agreed upon amount, $100. At a later date, defendant received an additional $20 from the victim to cover charges for dumping the trash.

During the early morning hours of Sunday, May 7, 1989, defendant broke into the victim's mobilehome. A neighbor was awakened and heard the words, "money, money, money." The neighbor saw a big shadow resembling a man pushing a woman around. The man was shirtless with straight hair.

Later that morning, Aquino's body was found lying beneath a mattress with her hands tied behind her. A sheet was wrapped several times around her face and there was an apparent bloodstain around her mouth. The northeast living room window screen was freshly cut by a sharp object but the glass window was intact.

---

[4]The factual history is taken from our prior opinion.

An autopsy of Aquino revealed she was 4 feet 11½ inches tall, weighed 85 pounds, and had suffered multiple trauma to her face, neck, and shoulders, resulting in abrasions, lacerations, and fractured ribs. The cause of death was suffocation from clothing which had been tightly wrapped around her face and neck, preventing her from breathing, and causing death in about three or four minutes. Aquino also suffered a jagged "hemorrhage" to the outside of her vagina while still alive. Expert testimony indicated a hair removed from the bedsheet was consistent with defendant's pubic hair.

Later on that same day, about 1:30 p.m., defendant told Francisco Sartiaguin that he had beaten or struck a man. Afterwards, he said it was an older man, then said it was an older woman. Defendant told Sartiaguin he had gone to the woman's mobilehome, where he tore out the telephone cord and beat her to frighten her, then tied her up and took about $200. Although defendant had no money the night before, on Sunday he was able to show Sartiaguin about $200: a $100 bill and some $20 bills. On Monday defendant was upset, telling Sartiaguin the older woman was dead.

On May 9, 1989, defendant was interviewed by Detective Morales and Sergeant Salazar. More than $100 was seized from his person upon his arrest. During the interview, defendant related many of the details of the crime. Defendant indicated he had been drunk and under the influence of marijuana when he went to Aquino's home. He said he went there to collect $20 and she bit him. He struck her in the face several times, struggled with her, and held her in a bear hug while he guided her around the mobilehome looking for money. When she finally told him that approximately $120 was near a chair or sofa in the living room, he tied her hands and covered her face with a sheet. He adamantly denied he had intercourse with her or that she was dead when he left the residence.

## DISCUSSION

*I. Defendant preserved his issues for appeal.*

■ We first address the People's claim that defendant "failed to preserve any issue" for appeal because defense counsel "simply did not make a motion of any kind."

First, it is unclear to us what motion the People claim should have been made. Defense counsel objected to the remand hearing in the absence of Judge Kim, and stated his reasons for objecting, both at the April 18 and June 20 hearings. Judge Kalashian informed defense counsel at the April 18 hearing, after hearing the objection to the hearing without Judge Kim: "It

may be an interesting issue, if there's another appeal, if it ever gets that far. I'm allowing you to make a record for that purpose." We find the issue was properly preserved for appeal.

Second, we disagree that any ruling we make would "necessarily ratify a proceeding at which the People's due process rights were grossly ignored." The People argue article I, section 29 of the California Constitution[5] would be violated by any decision from this court because their representative, Deputy District Attorney June, was "not even invited" to respond to defense counsel's arguments at the April 18 hearing, nor invited to "make his [own] record." This argument ignores some rather obvious points. Merely because the deputy district attorney was not "invited" to respond to the arguments or make his own record does not mean he was barred in any way from doing so. This was not a case, for example, where the deputy district attorney tried to respond, but was denied the opportunity. He simply failed to directly reply to the argument concerning Judge Kim's absence at both hearings.

Additionally, Judge Kalashian *went forward with the hearing*. He did not agree with defense counsel, and proceeded to cancel the *Wheeler/Batson* remand hearing without hearing argument from the prosecution. Thus, the People were not prejudiced in any way by their failure to respond to defense counsel's argument. Also, they had the opportunity here to fully address the issue in their brief.

Therefore, since defendant did preserve the issue of whether the remand hearing could properly occur without Judge Kim, we proceed to the merits of the appeal.

## II. The limited remand hearing was proper in the absence of Judge Kim.

Defendant argues "[a] limited remand was improper when the original trial judge had retired and declined to participate, and further violated the Fourteenth Amendment." We disagree.

To determine whether Judge Kalashian properly presided over the *Wheeler/Batson* hearing on remand, we: 1) look to the underpinnings of the *Wheeler/Batson* doctrine; 2) examine prior cases involving remands for *Wheeler/Batson* issues; and 3) analyze whether Judge Kim's absence deprived the hearing of a necessary element.

### A. Wheeler/Batson doctrine

 The purposes of the *Wheeler/Batson* doctrine have been espoused many times, and do not require much discussion. As our Supreme Court

---

[5]Article I, section 29 provides: "In a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial."

stated·in *People* v. *Hall* (1983) 35 Cal.3d 161, 166-167 [197 Cal.Rptr. 71, 672 P.2d 854]:

"In *People* v. *Wheeler, supra,* 22 Cal.3d 258, this court faced the task of accommodating the People's statutory right to exercise peremptory challenges with a defendant's constitutional right to a jury drawn from a representative cross-section of the community. We concluded that 'the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' [Citation.] And, recognizing that it is the 'responsibility of our courts to insure that [the constitutional] guarantee not be reduced to a hollow form of words, but remain a vital and effective safeguard of the liberties of California citizens' [citation], we undertook to establish a procedure for implementing that principle.

·"We began 'with the proposition that in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground.' [Citation.] The presumption is, however, rebuttable. [Citation.] 'If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. . . . If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. [Fn. omitted.]' [Citation.]" (Fn. omitted.)

To effectuate the goal of eradicating the use of peremptory challenges solely on the basis of group bias, our Supreme Court has directed: "[T]he trial court must make a 'sincere and reasoned attempt to evaluate the . . . explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [counsel asserting the peremptory challenges] has examined members of the venire and has exercised challenges for cause or peremptorily, for "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." ' [Citations.]" (*People* v. *Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452].)

### B. Prior cases involving Wheeler/Batson remand

Defendant cites to specific language in two California Supreme Court cases (*People* v. *Hall, supra,* 35 Cal.3d 161, and *People* v. *Snow, supra,* 44 Cal.3d 216), and two of our cases (*People* v. *Gore* (1993) 18 Cal.App.4th 692 [22 Cal.Rptr.2d 435], and *People* v. *Tapia* (1994) 25 Cal.App.4th 984 [30 Cal.Rptr.2d 851]) to support his argument that the limited remand was improper. We discuss those cases further now.

In *Hall,* the prosecutor used peremptory challenges to excuse at least four Black prospective jurors. (*People* v. *Hall, supra,* 35 Cal.3d at p. 164.) After two of the first three challenges were used against prospective Black jurors, the defendant requested the court require the People "to make a showing that no systematic exclusion of blacks was underway if any further peremptory challenges were used to exclude black prospective jurors." (*Ibid.*) After subsequent challenges were made against prospective Black jurors, the court asked the prosecutor for his explanation of why those jurors had been excluded, to which the prosecutor replied: " 'Miss Cotton, my confidential information indicated she has voted not guilty. I will allow the court to look at my records . . . . I have another reason why I excused Miss Cotton which I will take in conjunction with Miss Simon. Miss Simon indicated she had a son I believe to be approximately the same age as the Defendant. I believe that the Defendant, at the last trial, I understand at one point he live[d] in Chicago, I can't be sure, I believe he has some contact with Texas either in the military or something like that. Both Miss Cotton and Miss Simon said they were from Texas. That went into my considerations also. Miss Zetar . . . I excused her based on a conversation I had with a member of my office who brought her to my attention. As Mr. Goodman indicated to me in a prior case he had with her she did not comport herself as he felt a juror should, based on the evidence that was presented. As far as Mr. Robinson, I was watching Mr. Robinson . . . he segregated himself from the other members of the jury. Furthermore, I watched him in the courtroom today. There were light moments during the jury selection, however Mr. Robinson never cracked a smile. I came to my personal feelings based on his reaction in this courtroom that he did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case because it's a crime involving sexual assault which is a crime of sensitivity. For those reasons I have excused those names.' " (*People* v. *Hall, supra,* 35 Cal.3d at p. 165.) Afterward, the trial court "declined any inquiry into or examination of the prosecutor's explanation." (*Ibid.*) The defendant was subsequently convicted of aggravated assault and false imprisonment. On appeal, the Supreme Court reversed. The Supreme Court concluded the trial court had failed to satisfy its *Wheeler* obligation of inquiry and evaluation in the face of defendant's

prima facie case. (*Id.* at p. 168.) Regarding remand, the Supreme Court indicated: "The People have suggested that if this court concludes that the trial court failed to comply with the mandate of *Wheeler*, the matter be remanded for a new hearing at which the court may again rule on defendant's claim that the prosecutor's use of peremptory challenges was based on group bias. In some cases this procedure is preferable to reversal of the judgment. [Citations.] The procedure is not appropriate here, however. The proceedings were conducted more than three years ago. It is unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as required, which would demand that he recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised his other challenges." (*Hall, supra,* 35 Cal.3d at pp. 170-171.)

In *Snow,* the defendant was charged with intentionally killing a witness to prevent his testimony against the defendant in another criminal proceeding. (*People* v. *Snow, supra,* 44 Cal.3d at p. 219.) The defendant was found guilty as charged, and sentenced to death. On appeal, the defendant claimed "the prosecutor misused his peremptory challenges to exclude several Black persons from the jury." (*Id.* at p. 221.) The Supreme Court subsequently reversed.

First, the court reviewed the circumstances at trial which elicited defendant's contentions, noting: "As will appear, in the present case the trial judge expressed repeated concern about the prosecutor's apparent use of peremptory challenges to exclude Black persons from the jury. Indeed, our review of the voir dire examination indicates that several Black venirepersons were excused after giving seemingly routine, acceptable responses to the prosecutor's questions. (The Attorney General concedes that, as to three of the six prospective jurors in question, the record reveals no 'obvious' or 'apparent' reason for excusing them.) Yet, despite defendant's repeated objections, the judge inexplicably failed to demand any explanations from the prosecutor for his apparent pattern of improper peremptory challenges." (*People* v. *Snow, supra,* 44 Cal.3d at p. 223.)

Then, in responding to the People's suggestion that the court order a limited remand to permit the prosecutor to explain his reasons for excluding the jurors at issue, the court stated: "In *Batson,* the case had been tried only two years prior to reversal of the judgment. In the present case, voir dire examination commenced in November 1981, approximately six years ago. As in *Hall,* we believe it would be 'unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as

required, which would demand that he recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised his other challenges.' [Citation.]" (*People* v. *Snow, supra,* 44 Cal.3d at p. 227.)

Six years after *Snow,* we decided *People* v. *Gore, supra,* 18 Cal.App.4th 692. In *Gore,* the defendant was convicted by jury of two counts of first degree murder, and sentenced to life imprisonment without parole. After the 12 members of the jury were sworn, 4 prospective jurors were randomly drawn to begin the selection of the alternate jurors. The People's first three peremptory challenges were to the only three Hispanic persons called to the jury box. (*Id.* at p. 697.) The defendant then made a *Wheeler* motion. The trial court found the motion to be untimely with respect to the 12 jurors already seated, but timely as to the alternates. The trial court further found the defendant had made a prima facie case that the People were systematically excluding Hispanic jurors. After hearing the explanation from the prosecutor, the trial court denied the defendant's motion. (*Id.* at p. 699.)

On appeal, we concluded the *Wheeler* motion was timely as to all excluded jurors, including those from the seated and sworn 12-member panel. After reviewing *Snow,* we subsequently concluded: "The above quote suggests the California Supreme Court would order a limited remand in an appropriate case. The present case appears to be such a case. Jury voir dire began on March 23, 1992, and the jury was sworn on April 6, 1992. Because this was a death penalty case, it is likely counsel and the court paid close attention to and are more likely to remember the specifics of voir dire as opposed to less serious cases. Additionally, the voir dire was detailed and included a 15-page questionnaire. For those reasons, we hold a limited remand to be appropriate." (*People* v. *Gore, supra,* 18 Cal.App.4th at p. 706.)

Finally, in *People* v. *Tapia, supra,* 25 Cal.App.4th 984, the defendant was found guilty by jury of first degree murder, robbery, arson, and the unlawful driving or taking of a vehicle. He was sentenced to life imprisonment without the possibility of parole. During jury selection, the defendant brought two *Wheeler* motions, which were both denied. (*Id.* at p. 1006.) On appeal, we agreed with the defendant that the trial court had committed error. In deciding to remand the matter, we explained:

"Because of the *Wheeler* error, discussed in part 1 above, rather than reversing the judgment for a new trial outright, we believe fairness and justice will best be served if the judgment is reversed and the cause remanded to the trial court for a new *Wheeler* hearing. [Citations.] At the

hearing, the court will assume the defendant has established a prima facie case of wrongful exclusion of the Hispanic and Filipino jurors, thereby placing the burden of proof on the prosecution to justify the exclusion of those jurors. [Citation.] The court will then make a ' "sincere and reasoned attempt to evaluate the [prosecutor's stated reasons for challenging the Hispanic Filipino jurors] . . . in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [prosecutor] has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' " ' [Citations.]

"We believe the trial court should have no difficulty in recalling the circumstances of the case as they existed at the time of the *Wheeler* motion and the manner in which the prosecutor examined the other prospective jurors and exercised his peremptory and 'for cause' challenges. The trial court will have available for its review the transcript of the voir dire examination of the jurors, the written questions and answers signed by the prospective jurors before voir dire, and the detailed reasons stated by the prosecutor for challenging the jurors. We have confidence that after a careful reading of the record and this opinion, the trial court will be able to fulfill its constitutional obligation under *Wheeler, supra.*" (*People* v. *Tapia, supra,* 25 Cal.App.4th at pp. 1031-1032.)

### C. Discussion

█ Defendant does not dispute that a limited remand hearing, generally, was the appropriate procedure to use in this case. Rather, defendant contends the hearing was improper unless conducted by Judge Kim. Thus, the issue can be distilled to the following: Based on the facts of this case, was Judge Kim's presence a *necessary* element to provide a proper *Wheeler/Batson* hearing to defendant? We conclude it was not.

A review of the above cases, and others involving remanded *Wheeler/ Batson* hearings (see, e.g., *U.S.* v. *Alvarado* (2d Cir. 1991) 923 F.2d 253; *U.S.* v. *Alcantar* (9th Cir. 1990) 897 F.2d 436), reveals that, as a general proposition, the presence of all the original players at the remanded hearing is important to the decisionmaking process. The opinions make reference to, for example, the fact that in a death penalty case it is likely the trial court paid close attention to, and could recall the specifics of, voir dire. (See *People* v. *Gore, supra,* 18 Cal.App.4th 692, 706.) As defendant states in his brief, "[w]hen the original trial judge was unavailable, the hearing judge had

*no recall.*" This does not mean, however, that the original trial judge's presence is always *required.* The facts in this case provide an example.

Here, the deputy district attorney provided the court with detailed reasons why he excluded each of the two jurors. First, regarding Amelia R., after providing the court an explanation of his reasons, there was the following discussion:

"MR. JUNE [deputy district attorney]: If you want a synopsis, this was an unintelligent juror who was at a complete loss as to understanding the legal burden that the trial was going to proceed by, who according to two places in the transcript did not—was apparently not able to make a grammatical sentence. An individual who had a niece murdered, which regardless of any statement that it would or would not affect her, was much too close to the type of case that was being tried. For those reasons.

"THE COURT: How about that she had sat on a rape trial?

"MR. JUNE: That was a concern also. One of the charges was a rape charge. It was never inquired as to whether she was the juror or jurors that hung the case. But I noted in my original handwriting at the time that this came up, it was March of the same year that this case was being tried. That was a large concern.

"THE COURT: There was a rape charge?

"MR. JUNE: There was a rape. One of the special circumstances was rape in this case."

Then, subsequent to his detailed explanation regarding the peremptory challenge of Donna S., the deputy district attorney provided this synopsis:

"I was very, very concerned with the fact that there was a contractual relationship with the judge that was sitting as the trial judge. Like the other juror, I was very concerned with the fact that there was at least some initial confusion on the legal standard that was going to be used in the trial.

"I was very, very concerned with the responses from the juror that her brother-in-law was convicted of first degree murder, which was the very crime that we were trying here, notwithstanding her response that that would not affect her in the transcript.

"I was also concerned, which in a case not of this magnitude probably would cause less concern, with the fact that a Visalia police detective was in

a close enough relationship to the juror that he was apparently a godparent of the daughter."

What stands out among June's explanations, and why we find that Judge Kalashian was able to properly preside over the remand hearing in the absence of Judge Kim, are the *objectively verifiable* reasons provided for the exclusion of the two jurors. This was not a case, for example, where the reasons for exclusion of the jurors were such things as the tone of voice the juror used in response to questions, the way a juror looked at the attorney during questioning, or the body language of the juror. To put it another way, these were not situational exclusions, where one needed to be present to understand the peremptory challenges. Thus, the original trial judge's presence was not necessary to evaluate the reasons given for exclusion, and determine if they satisfied the requirements under *Wheeler/Batson*.

Here, the charges against defendant included rape and murder. Amelia R. sat on a rape case that resulted in a hung jury. Donna S. had a brother-in-law who was convicted of first degree murder. Clearly, the presence of the original trial judge is not required to evaluate these reasons. Additionally, concerning the ability of Amelia R. to understand the burden of proof, it is evident from Judge Kalashian's decision that he was able to review the record and confirm the alleged difficulty.

In a further attempt to support his argument, defendant also relies on *People* v. *Allen* (1979) 23 Cal.3d 286 [152 Cal.Rptr. 454, 590 P.2d 30]. In *Allen*, the People suggested the court remand the case back to the trial court to allow for an additional opportunity to explain its use of peremptory challenges. The Supreme Court, however, rejected this suggestion, stating, "We believe the disposition directed in *Wheeler* is appropriate in light of the infeasibility of accurately probing and assessing the prosecutor's motivation at this late date." (*Allen, supra,* 23 Cal.3d at p. 295, fn. 4.) Such infeasibility is not the case here, however, because of the *objectively verifiable* reasons proffered by the deputy district attorney.

As our Supreme Court stated in *Hall*, one of the reasons we rely on the good judgment of the trial courts is their "knowledge of trial techniques." (*People* v. *Hall, supra,* 35 Cal.3d at p. 167.) Judge Kalashian did not have to be present at the original trial to understand the reasons put forth here, and undertake a sincere and reasoned attempt to evaluate those reasons. Rather, his experience and knowledge of trial practices, along with his examination and observations of the deputy district attorney at the June 20 hearing, were sufficient to satisfy the purposes of the limited remand hearing, and the principles underlying *Wheeler/Batson*.

Therefore, we find that although the presence of all the original participants is an important factor for remanded *Wheeler/Batson* hearings, on the facts here, Judge Kim's presence was not necessary to provide a constitutionally proper proceeding.

### D. Fourteenth Amendment

Defendant also contends his equal protection rights under the Fourteenth Amendment were violated. Specifically, defendant claims that "given the passage of time and the original trial judge's retirement, [there] was no way to reconstruct the circumstances as they existed at the time of trial," thus rendering the remanded hearing inadequate. For the reasons stated above, we disagree.

### III. The Donna S. contractual relationship explanation does not require reversal.

During the June 20 hearing regarding excluded Juror Donna S., the deputy district attorney informed the court:

"We were told—the record does not reflect this fact, it was at a bench conference or a chambers conference, Judge Kim called Mr. Smuckler and myself aside and informed us that this particular juror was in a contractual relationship with Judge Kim in the form of boarding horses.

"It was my understanding at the time that she apparently paid him some form of re[mun]eration to keep her horses at some stable or some property that Judge Kim was in control of. I wrote that in handwriting. Nowhere does that appear on any of the forms. Nowhere does that appear on any of the transcripts with a passing mention to boarding horses within her transcript.

"The fact that this witness was in a contractual obligation with the trial judge caused me great concern, maybe perhaps not with the trial judge doing anything improper, but some inexperienced lack of expertise, something that would put this juror in contact with Judge Kim on a regular basis while a death penalty trial was going on."

Defendant contends "[t]he false, Donna S. contractual relationship explanation militated against another, normally adequately neutral explanation taken at face value," and "violated the Fourteenth Amendment Equal Protection Clause. . . ." We reject defendant's contentions.

Defendant relies heavily on the Ninth Circuit case of *U.S.* v. *Chinchilla* (9th Cir. 1989) 874 F.2d 695. In *Chinchilla*, the two Hispanic defendants

appealed their marijuana-related convictions, alleging discriminatory use of peremptory challenges in jury selection. The court pointed out "the prosecutor (1) challenged all Hispanic jurors; (2) used his first peremptory challenge to strike the only Hispanic juror; and (3) exercised his sole challenge to the alternate pool to remove the only other Hispanic in the jury pool." (*U.S.* v. *Chinchilla, supra,* 874 F.2d at p. 698, fns. omitted.) The prosecutor explained his bases for the challenges were "type of employment, age, and residence." (*Ibid.*) On review, however, the Ninth Circuit pointed out that an unchallenged juror lived in the same city as one rejected juror, and the jurors did not state their ages for the record, so the court had no evidence of ages. In reversing the convictions, the court found "the government's explanation in this case was not sufficiently 'clear and reasonably specific.' [Citation.]" (*Ibid.*) The court further stated: "Thus, the court is left with only two acceptable bases for the challenges: poor appearance for the alternate and choice of employment for the potential juror. Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency. [Citation.]" (*U.S.* v. *Chinchilla, supra,* 874 F.2d at p. 699.) We find *Chinchilla* distinguishable.

Although defendant continually alleges the contractual explanation is *false* he offered no affirmative evidence either at the June 20 hearing, or here, that it was false. Defendant also claims that "[f]or defense counsel to perform meaningfully his role to rebut the prosecutor's supposed neutral reasons for striking minority jurors, he needs to be given the opportunity to point out that the prosecutor's claims about the particular juror are false." This argument ignores the fact that defense counsel *was* given the opportunity. At the June 20 hearing, defense counsel informed the court he had no notes to reflect that Judge Kim disclosed a contractual relationship. Defense counsel also later reiterated his position, and told the court: "Then with regard to this other issue about somehow she's involved in a contractual relationship with the judge, first of all, like I said, I don't remember it, which is a problem. I don't have anything written down. There's nothing in the record. This Court is not the Court who was there at the time. So again I have a big problem with using that as any sort of consideration in this motion, given the fact that the actual trial court is not here to rule on this portion."

We agree with defendant that because of its failure to appear in the record, the proffered reason concerning the alleged contractual relationship simply should not have been given any weight by Judge Kalashian in making his decision. Review of Judge Kalashian's decision confirms he both honored defense counsel's request and properly performed his duty by not relying on the alleged contract as a race-neutral reason for exclusion.

Additionally, there is a significant qualitative difference between an alleged reason not being reflected in the record, as is the case here, and a reason actually shown to be inconsistent among individual jurors, as in *U.S. v. Chinchilla*, *supra*, 874 F.2d 695. The deputy district attorney, for example, did not exclude Donna S. because of her alleged contractual relationship with Judge Kim but then allowed a non-Hispanic juror to sit on the jury who did have a contractual relationship with Judge Kim. Also, unlike *Chinchilla*, the other reasons provided by the deputy district attorney here were directly related to the case being prosecuted. Amelia R. and Donna S. were not excluded because of such generalized reasons as alleged poor appearance, or age, or choice of employment. Instead, this was a case involving charges of rape and murder. One had served on a hung jury in a rape case, the other had a brother-in-law convicted of first degree murder.

Thus, we find that merely because one of the reasons for exclusion of a juror fails to appear in the record, this fact does not, on its own, mean the other race-neutral reasons are false.

*IV. The race-neutral reasons provided for exclusion were not a pretext for discrimination.*

Last, defendant claims that he "comparatively showed that facially race-neutral reasons were a pretext for discrimination." We interpret this as an argument that there was not substantial evidence to support the trial court's conclusion that Amelia R. and Donna S. were excluded for race-neutral reasons. Again, we disagree.

*A. Standard of review*

A trial court's ruling on a *Wheeler* motion is reviewed for substantial evidence. (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 196-197 [58 Cal.Rptr.2d 385, 926 P.2d 365].) "Although such a ruling broadly resolves a predominantly factual mixed law-fact question, as a general matter, at least, it narrowly depends on the answer to a purely factual question. . . . It follows that the determinations underlying a ruling of this sort, that is, whether the defendant bore his burden of a prima facie showing of the presence of purposeful discrimination and, if he succeeded, whether the prosecutor bore his consequent burden of a showing of its absence, are themselves examined for substantial evidence: they are each reducible to an answer to a purely factual question, as identified above." Thus, a great amount of deference is given the trial court's determination of whether peremptory challenges are exercised in a discriminatory manner.

"As the United States Supreme Court has observed: 'Deference to trial court findings on the issue of discriminatory intent makes particular sense in

this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." [Citation.] In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." [Citations.]' *(Hernandez* v. *New York* (1991) 500 U.S. 352, 365 [111 S.Ct. 1859, 1869, 114 L.Ed.2d 395].)" *(People* v. *Jones* (1997) 15 Cal.4th 119, 162 [61 Cal.Rptr.2d 386, 931 P.2d 960], overruled on other grounds in *People* v. *Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

## B. Discussion

■ As articulated earlier, on remand the trial court here was required to make: "[A] sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." *(People* v. *Hall, supra,* 35 Cal.3d at pp. 167-168.) ■ Our Supreme Court has defined this evaluation as follows: "[A] truly 'reasoned attempt' to evaluate the prosecutor's explanations [citation] requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." *(People* v. *Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75].)

This step in the process, however, "does not demand an explanation that is persuasive, or even plausible." *(Purkett* v. *Elem* (1995) 514 U.S. 765, 768 [115 S.Ct. 1769, 1771, 131 L.Ed.2d 834].) "The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citations.]" *(People* v. *Arias* (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1218 [255 Cal.Rptr. 569, 767 P.2d 1047] ["Nowhere does *Wheeler* or *Batson* say that trivial reasons are invalid. What is required are reasonably specific and neutral explanations that are related to the particular case being tried"].)

 Here, the trial court properly performed its function in determining that the People had articulated a race-neutral basis with respect to each juror. In making its ruling, the trial court had the opportunity to review the record and assess the deputy district attorney, and concluded the stated bases for the respective challenges were genuine. There were only two jurors at issue, and each was addressed individually, both at the June 20 hearing and in the court's subsequent finding. Significantly, we note that Judge Kalashian took great pains to keep the discussion concerning Amelia R. and Donna S. separate and distinct.

In addition to the trial court finding the bases stated by the People with respect to each prospective juror to be nondiscriminatory and genuine, the stated reasons were also clearly related to the particular case being tried. Amelia R. was challenged based on her difficulty in understanding the burden of proof, and because she sat on a hung jury in a prior rape trial. Donna S. was challenged, in part, because her brother-in-law was convicted of first degree murder. These reasons satisfy the requirements under *Wheeler/Batson* and their progeny, and we find no reason to disturb the court's findings.

Defendant's claim that he was able, by use of comparative analysis, to show the race-neutral reasons were a pretext for discrimination, has previously been addressed by our Supreme Court in *People* v. *Jackson* (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254].

In *Jackson*, the defendant was found guilty of murder and conspiracy to commit murder, and sentenced to death. On his automatic appeal to the Supreme Court, the defendant claimed the trial court erred in failing to grant his motion to dismiss the jury panel. (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1195.) The prosecutor used three of eighteen peremptory challenges to remove Blacks from the jury. As a result, no Blacks served on the defendant's jury. The defendant claimed that when the responses of stricken potential jurors were compared to the answers of Whites who served as jurors, the prosecutor's otherwise race-neutral reasons were undermined. Specifically, the defendant claimed his "comparative analysis strips away a facade of racial neutrality to expose underlying racial bias in the jury selection." (*Id.* at p. 1197.)

In rejecting defendant's contentions, the Supreme Court concluded: "As this court has stated: 'If the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations . . . .' [Citation.] Here, there is no reason to conclude that the trial

court did not make a 'sincere and reasoned effort' to evaluate the credibility of the prosecutor's nondiscriminatory justifications. Although the trial court's statement was brief, it apparently independently assessed the prosecutor's reasons for peremptorily challenging the jurors. [Citations.] This court has further held that *Wheeler* does not require the trial court to conduct further inquiry into the prosecutor's race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper. [Citation.]" (*People* v. *Jackson, supra,* 13 Cal.4th at pp. 1197-1198.)

As in *Jackson,* there is no reason here to believe the trial court did not make a sincere and reasoned effort to evaluate the credibility of the deputy district attorney's race-neutral reasons for the exclusion of Amelia R. and Donna S. Further, defendant offers no such reasons. Thus, we will not reassess good faith by conducting our own comparative juror analysis.

We find there was substantial evidence to support the court's finding. The race-neutral reasons provided by the deputy district attorney were not a pretext for discrimination as claimed by defendant, and did not violate the Fourteenth Amendment.

### DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Buckley, J., concurred.

A petition for a rehearing was denied January 6, 2000, and appellant's petition for review by the Supreme Court was denied March 15, 2000.